POLSTON, J.,
dissenting.
I agree with the majority that a juror’s surname by itself does not indicate that the person is a member of a distinct racial group. See State v. Alen, 616 So.2d 452 (Fla.1993). But the majority seriously errs by expanding its ruling beyond the conflict issue and dramatically changing the landscape of jury selection.
The majority essentially requires evi-dentiary hearings to identify an individual juror’s distinct racial or ethnic group. Not only is this practice unnecessary and intrusive, but it also is contrary to this Court’s precedent. Specifically, by requiring this level of evidentiary proof of a juror’s particular race or ethnicity, the majority is receding from Franqui v. State, 699 So.2d 1332 (Fla.1997). Franqui had encouraged trial courts to move through the Melbourne process once the parties and the trial court became aware of a race-based objection to a peremptory challenge.
The record in this case demonstrates why trial courts should be allowed the discretion to move through the Melbourne process and simply ask for a race-neutral reason without holding a mini-trial regarding the background, gender, and race of the particular venireperson challenged. When the defense attempted to strike Mr. Buchholz, the trial court was in the position to understand that the defense had been attempting to strike the white members of the venire, such as Mr. Buchholz. In fact, the defense very clearly articulated its race-based goals for jury selection when stating on the record, “This is a black defendant and he needs to be judged by a jury of his reasonable peers, not white folks in Dade County.” Appendix at 42.[8]
Accordingly, because the trial court properly adhered to this Court’s precedent by erring on the side of requesting a race-neutral reason without conducting a needless evidentiary hearing and because the record in this case demonstrates the soundness of this precedent, I respectfully dissent.
I.
Prior to the majority’s decision in this case, when the race or ethnicity of a prospective juror was obvious, the trial court could presume an objection to the peremptory strike of a juror was based on the juror’s race or ethnicity, and no further evidentiary proof was required. See Franqui, 699 So.2d at 1332. In Franqui, the State challenged the defendant’s peremptory strike of prospective juror Aurelio Diaz without identifying the distinct ethnic group to which Mr. Diaz belonged. Id. at 1334. On appeal, the defense argued that *1117 the trial court erred by denying the defendant’s peremptory strike because the objection was insufficient to satisfy the first step of Melbourne. Id. at 1334. This Court rejected the defendant’s argument and found the State’s objection was sufficient under Melbourne. Id. at 1335. This Court explained: “[T]he trial court clearly understood that the objection to the challenge of a venireperson in Dade County, who was born and raised in Havana, Cuba, and whose name was Aurelio Diaz, was being made on racial grounds.” Id.
The dissenting opinion stated:
I believe that the State’s objection here was insufficient to require the defendant, the party exercising the peremptory challenge, to justify his peremptory strike. This record simply does not demonstrate that the challenged juror was a member of a protected group ór that the challenge appeared to be used in a racially discriminatory manner. It is a stretch of the imagination and beyond logic how the majority, as the appellate court charged with reviewing the trial court’s action, can conclude from this record that “the trial court clearly understood that the objection to the challenge of a venireperson in Dade County, who was born and raiséd in Havana, Cuba, and whose name was Aurelio Diaz, was being made on racial grounds.” In fact, at oral argument, the State candidly conceded that we . cannot know from this record whether the challenged juror was a member of a distinct racial group, or whether his color or national origin was even the basis of the State’s objection to the strike.
Id. at 1340 (Harding, J., dissenting) (emphasis added) (citation omitted). In rejecting the dissenting opinion in Franqui, the majority reasoned that the trial court understood the objection was on racial grounds and there was never any contention that the juror was not a member of a cognizable minority or that there should not be an inquiry. Id. at 1335. Further, this Court stressed that “we have encouraged trial judges to err on the side of holding a Neil inquiry.” Id. (citing State v. Slappy, 522 So.2d 18 (Fla.1988)).
Therefore, this Court in Franqui, 699 So.2d at 1332, encouraged trial courts to move through the Melbourne process once an objection was made and the parties and trial court were aware of the type of objection made. We explained that when an objection to a peremptory challenge is obviously based upon a juror’s race, the trial court may ask the challenging party for a race-neutral reason for the strike and then evaluate the reason to determine whether it is credible. Franqui, 699 So.2d at 1335. That is exactly the process the trial court followed here in Smith. However, the majority now abandons the view that encouraged trial courts to err on the side of holding a Neil inquiry in favor of requiring proof, just like the dissent that was rejected in Franqui.
Specifically, in contrast to Franqui, the majority today holds that the objecting party must prove that the potential juror is a member of a distinct racial group. To do so will require an evidentiary hearing. But to hold an evidentiary hearing in every instance where a Melbourne issue arises is not what this Court has previously required — for good reason. It is unworkable. In order to prove membership in a distinct racial- group, the objecting party would first have to identify and prove a cognizable class:
First, the group’s population should be large enough that the general community recognizes it as an identifiable group in the community. Second, the group should be distinguished from the larger community by an internal cohesiveness of attitudes, ideas, or experiences that *1118 may not be adequately represented by other segments of society.
Alen, 616 So.2d at 454. Second, the objecting party would need to prove that the juror is part of that cognizable class. This process will cause numerous mini-trials during the jury selection process, which is inefficient and not what our precedent requires.
In this case, an evidentiary hearing to determine whether Mr. Buchholz is a member of a cognizable class serves no purpose. Mr. Buchholz is white,[9] and people who are white are considered a distinct racial group under Melbourne.[10] Additionally, the record indicates that during voir dire, when it was not clear whether a particular racial group was applicable, the attorneys objected and an inquiry was held.[11] No similar exchange occurred regarding Mr. Buchholz, so there was no need for the prosecution to establish membership of a distinct racial group as done with Ms. Alpizar. Therefore, in this case, the trial judge properly proceeded to steps two and three of the Melbourne inquiry.
But even though the majority is willing to accept as a matter of law (without deciding the matter) that German is a cognizable . class under Alen, the majority still requires a determination not only of whether German is a cognizable class, but also of whether Mr. Buchholz is a member of that.class. See majority op. at 1114. Why? Requiring this type of evidentiary hearing for every juror where this line of questioning occurs is inefficient, will unduly result in mini-trials, and will place prospective jurors in potentially very awkward positions. It is not necessary.
Even if a juror appears to be within a certain racial group, as Mr. Buchholz ap *1119 peared white, the majority is requiring the objecting party to prove that juror’s distinct racial or ethnic group. This level of proof may not be easy for , everyone. Moreover, the names of racial and ethnic groups have different meanings to different people. See Kenneth E. Payson, Comment, Check One Box: Reconsidering Directive No. 15 and the Classification of Mixed-Race People, 84 Cal. L.Rev. 1233, 1241 (1996) (“Racial categories and the rules of classification have varied from place to place and over time....”); see also Naomi Mezey, Erasure and Recognition: The Census, Race, and the National Imagination, 97 Nw. U.L. Rev. 1701 (2003). In this case, the defense objected to “white Latinos” being seated on the jury. Are the parties therefore required to have an evidentiary hearing on whether “white Latinos” satisfy the criteria of Alen as a cognizable class, and whether the individual jurors actually belong to that class? See generally Payson, supra, at 1241 (explaining “the social reality that Latinos in the United States are generally perceived as non-White, in contrast to [a federal directive’s] presumptive fiction that Latinos are White”). Even if someone appears white, the majority opinion requires evidentiary proof of the matter and a determination of what type of white person they are. Does it require the same for gender? How are multiracial jurors to respond to questioning under oath about their race and national origin? What if someone is unsure of their exact racial composition? The level of proof the majority requires is absurd, unnecessary, and too invasive, especially in a case such as this where the parties did not even question it.
Further, how should the evidentiary hearing be conducted? The majority has not made clear what the trial court should have done in this case. The majority states that simply asking jurors will suffice,[12] but the majority does not indicate what specific question should be asked. It is unlikely that the legally accurate question, “Are you a member of a cognizable class?,” will lead to useable responses. Moreover, in cases where a trial court has conducted an inquiry of an individual juror’s race or ethnicity, the scope of the questioning has varied. In some cases, the inquiry ends after the juror is asked to inform the court of his or her birthplace. See Dean v. State, 703 So.2d 1180 (Fla. 3d DCA 1997) (recalling a prospective juror to inquire into his place of birth and heritage to determine whether he was Hispanic). Is that enough? Certainly, identifying a person’s birthplace does not prove that a person is a member of a distinct racial group since not all people from the same country are the same race.
In other cases, the inquiry has ended after establishing a prospective juror’s nationality. In Windom v. State, 656 So.2d 432 (Fla.1995), for example, the following dialogue ensued during voir dire:
[DEFENSE COUNSEL]: I’d like to question that choice too, assuming she is black.
[PROSECUTOR]: I don’t believe she is.
THE COURT: It says Hispanic.
[PROSECUTOR]: I think she is actually Indian.
With this uncertainty, the court and counsel agreed to inquire of the person further:
*1120 THE COURT: Hi. What is your nationality?
[JUROR]: East Indian.
THE COURT: Okay, That’s all we need to know. Thank you. She is definitely not a recognized minority. She’s East Indian.
[DEFENSE COUNSEL]: Everybody in Trinidad is black.
[PROSECUTOR]: Not everybody because she is, obviously, not.
[DEFENSE COUNSEL]: She may be Indian.
Id. at 436-37. Upon review, this Court never discussed its specific approval or disapproval of the inquiry. This Court held only that the defendant’s objection was insufficient because the defendant failed to “make a timely objection in which it was demonstrated on the record that this venire person was a member of a cognizable class.” Id. at 437.
In another case, the Fourth District reviewed a case where the State exercised a peremptory challenge against a prospective juror named Mohammed Kahn. Olibrices v. State, 929 So.2d 1176, 1176 (Fla. 4th DCA 2006). Defense counsel objected under Melbourne, and the following ensued:
Court: Is he a minority that’s recognized under Neil Slappy? I have never heard Muslim recognized under Neil Slappy.
Defense: Your honor, if you give me a moment to look through my notes, that Neil Slappy can be used on anyone now.
Court: No, not anyone. It has to be a recognized class of people that resides in the Community. So far, the cases I have seen are race. I have seen Spanish, Jewish; I haven’t seen any Muslim.
State: Your honor, I don’t know if he was ever asked that question. I don’t know what his religious affiliation is. How could I strike somebody on religious affiliation?
Court: He is Pakistani. And I don’t think there’s a significant number of Pakistanis in the United States to come under Neil Slappy. There was nothing shown as to his religion.
State: Is it Hindu? I don’t know what the religion is in Pakistan.
Defense: There are many Muslims.
[[Image here]]
Court: Okay. I think counsel is looking up whether or not Pakistani comes under Neil Slappy, and I haven’t seen a case where Pakistani — . By that theory, then, everyone would come under Neil Slappy because everyone came from somewhere.
Defense: Your Honor, I said the fact that he was Muslim.
Court: There was no testimony whatsoever that he is Muslim, was there? It’s just an assumption on your part. He said he was Pakistani. That’s the ethnicity that I have.
Defense: And that assumption is based on, Your Honor, the name Mohammad is common.
Court: Well, unless you can show me a case where a Pakistani is excluded, or that’s something under Neil Slappy, that Pakistanis are a recognized group that comprises a group under Neil Slap-py. I have never seen a case on that. So I will deny it. Okay. He is struck. Mohammad Khan is struck by the state.
Id. at 1177 (footnote omitted).
In both Olibrices and Windom, questioning ensued to determine whether the objecting party had established the first step of Melbourne as the majority requires in this case. However, in both cases, the questioning served little purpose in the actual determination of whether the juror was a member of a cognizable class. This *1121 ineffective and invasive questioning demonstrates the complexity of class determinations, the various related issues that may arise, and the additional evidence that parties will be required to submit for every juror subject to Melbourne under the majority’s opinion.
In my view, this Court in Franqui had the right approach in encouraging the trial court to err on the side of simply asking for a race-neutral reason. There is no need to recede from that approach as the majority does here. However well-intended, the additional and enormous burden of requiring proof of a juror’s race is unnecessary and unclear. We have set the law adrift even more.
II.
Furthermore, the record in this case demonstrates why trial courts should have the discretion to move to the second and third steps of Melbourne. After all, the trial court is in the best position to assess whether the parties are attempting to unconstitutionally exclude certain members of the panel from the jury. As this Court has explained, “the appropriate standard of appellate review for determining the threshold question of whether there is a likelihood of racial discrimination in the use of peremptory challenges is abuse of discretion.” Nowell v. State, 998 So.2d 597, 602 (Fla.2008). “[T]he trial court is in the best position to assess the genuineness of the reason advanced.... ” Id. In fact, “the trial court’s decision [regarding genuineness] turns primarily on assessment of credibility and will be affirmed on appeal unless clearly erroneous.” Melbourne, 679 So.2d at 764-65; see also Jones v. State, 923 So.2d 486, 490 (Fla.2006) (“When reviewing the trial court’s decision on a Neil-Slappy claim, appellate courts are to keep in mind that ‘the trial court’s decision turns primarily on an assessment of credibility and will be affirmed on appeal unless clearly erroneous.’” (quoting Melbourne, 679 So.2d at 764-65)).
Findings by a trial court and the appellate review of those credibility findings according to a “clearly erroneous” standard of review were explained by the United States Supreme Court in Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). “A finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” Anderson, 470 U.S. at 573, 105 S.Ct. 1504 (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). There should be greater deference to trial court’s findings when they are based on assessments of credibility because “only the trial judge can be aware of the variations in demeanor and tone of voice that bear so- heavily on the listener’s understanding of and belief in what is said.” Id. at 575, 105 S.Ct. 1504. “If the [trial] court’s account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Id. at 573-74, 105 S.Ct. 1504 (emphasis added).
Accordingly, under Anderson, rather than narrowly focusing on an individual juror, the whole voir dire record should be considered to determine whether the trial judge’s ruling was clearly erroneous.
Had the majority witnessed voir dire as the trial court did, or even considered the entire voir dire record here, it would have been clear that both parties were posturing and that the trial judge wisely moved through the Melbourne process when the defense attempted to exercise a perempto *1122 ry challenge of juror Buchholz. Significantly, during the jury selection process in the instant case, the defense argued that the. State was trying to strike black jurors, and the State argued that the defense was trying to strike jurors who were not black.[13] For example, during voir dire, the prosecution, objected to the defense striking a Hispanic female, noting that the defense had previously struck Hispanics from the jury panel. See appendix at 39. And during argument pertaining to a peremptory challenge raised by the State, the defense noted that it had “lost count of all the black females that [the State] has stricken” and, with rare clarity, stated, “[t]his is a black defendant and he needs to be judged by a jury of his reasonable peers, not white folks in Dade County.” Appendix at 41-42 (emphasis added).[14] Clearly, the defense did not want jurors who were white — that included Mr. Buchholz.
Here, while properly proceeding through a Melbourne inquiry, the trial court asked for a race-neutral explanation. The defense cited juror Buchholz’s prior jury service — the same reason the prosecution had just provided for the immediately preceding juror. Although both sides gave apparent race-neutral reasons, the trial court rejected the reasons as not genuine. Because each side accused the other of trying to obtain a jury of a particular racial mix, the trial judge made credibility determinations as required by Melbourne and made rulings against both sides. The trial court was in the best position to make those findings, and the rulings are not clearly erroneous. The majority should not substitute its own credibility findings for those of the trial judge. Rather, the trial court’s ruling that the race-neutral reasons given by the defense were not genuine was amply supported by the record and should be affirmed by this Court.
Although the defense’s statement that he did not want “white folks” serving on the jury came after the ruling as to Mr. Buchholz, it demonstrates why trial courts should have the discretion to move through the Melbourne process. The trial judge was in the best position to evaluate voir dire, and the ruling was validated by later comments made by the defense. Making its own evaluation, the majority’s ruling now improperly reverses the trial court’s ruling and holds that the trial court should have allowed the defense to strike Mr. Buchholz, one of the “white folks.”
III.
The majority errs by expanding its ruling beyond the conflict issue and by dramatically changing the process of jury selection by receding from Franqui and placing an unnecessary and illogical burden on trial courts and prospective jurors that will undoubtedly result in prolonged and inefficient voir dire proceedings. Furthermore, the voir dire record in this case clearly demonstrates why trial courts should be allowed to exercise discretion *1123 and ask for a race-neutral reason for a peremptory challenge without holding a mini-trial to establish what particular cognizable class a particular venireperson is a member of.
I would affirm. Therefore, I respectfully dissent.

APPENDIX

THE COURT: All right. Did you change your mind about anybody, prosecution?
MS. MATO: I would move, Judge, to strike Mr. — Juror No. B, Colas.
MR. CASASNOVAS: Judge, we are going to raise an objection as to a Ne[il] Slappy. I believe Mr. Colas is a member of a minority group known as Latinos.
THE COURT: Since when is that a minority group?
MR. CASASNOVAS: Not in Dade County, I know.
THE COURT: I think under the present law I have to require that you explain it.
MS. MATO: Yes, Judge. Simply Mr. Colas has served on a jury before. And his fíancée’s son has been arrested. He has also been a victim of a crime several times.
MR. CASASNOVAS: That would inure to the benefit of the defense. We are not objecting on those grounds.
MS. MATO: You chose to exercise a peremptory?
THE COURT: I don’t think that is a genuine objection. I’m going to overrule you.
MR. CASASNOVAS: I’m sorry, Judge. What did you just say?
THE COURT: I overruled her.
MR. CASASNOVAS: All right.
THE COURT: So he is foreseated.
MS. MATO: He is what, I’m sorry?
THE COURT: Foreseated.
MS. MATO: You are not excusing him?
THE COURT: No.
MS. MATO: All right. Your Honor, if I may have a moment.
Judge, I know that when Mr. Colas was questioned about his fíancée’s son’s treatment by law enforcement or by the system in general, he indicated that he thought that he had received a harsher punishment than the other cases that were in court that day. No, he did not feel that, you know, he was not really certain in terms of whether he — whether he was treated fairly or not. So, that is another reason that I have, Judge, for requesting — exercising a peremptory on him.
THE COURT: There is no need to argue. I’m denying it — your objection, whatever you want to call it.
All right. So, we have six. Anything else, anybody?
MR. CASASNOVAS: We are going to ask for a peremptory on Mr. Buchholz, No. 12.
MS. MATO: Judge, I would—
THE COURT: Wait a minute. What about Buchholz? You are peremptorily challenging him?
MR. CASASNOVAS: Yes, sir.
THE COURT: Are you requiring an explanation?
MS. MATO: Yes, Judge.
MR. CASASNOVAS: Is he a member of a distinct minority group which would render him—
THE COURT: Buchholz?
MR. CASASNOVAS: Yes.
*1124 THE COURT: Sounds to me like a German name.
MR. CASASNOVAS: This is a recognized minority group within the law, I believe. Mr. Buchholz—
THE COURT: I suppose there is — anybody qualifies under our present great, deeply thought out appellate decisions.
MR. CASASNOVAS: He is a victim of a house robbery which makes him a victim of a crime. And he can harbor bias or any difficulty in this case—
THE COURT: The Court will rule that is not a genuine objection and it is overruled.
MR. CASASNOVAS: We have several others.
THE COURT: Go ahead.
MR. CASASNOVAS: He served on a jury.
THE COURT: He served on a jury in Ohio.
MS. WRIGHT: St. Louis.
MR. CASASNOVAS: In a criminal case.
MS. MATO: Those were the same reasons I requested that juror No. 3 be excused.
THE COURT: We are done with Juror No. 3.
MS. MATO: The reasons they said were not the same reasons they are saying for Juror No. 12.
THE COURT: I don’t think that the objections to Buchholz are genuine. I’m going to overrule it.
MR. CASASNOVAS: That is over our respectful objection.
THE COURT: That’s correct.
Defense, anybody else?
MR. CASASNOVAS: We move to strike Ms. Lorie, No. 13.
THE COURT: All right.
MR. CASASNOVAS: On peremptory grounds.
THE COURT: All right. Strike No. 4. All right.
Next one up would be then 17, Adderley, prosecution?
MS. MATO: I move for a cause challenge.
THE COURT: Speak.
MS. MATO: Yes. For one thing, she was very clear in that she could not find the defendant guilty based solely on testimonial evidence, despite the fact that that is not what the law requires.
So she, therefore, cannot follow the law. She also made several comments about police officers. For those reasons, Judge, I would move for a cause challenge on her.
THE COURT: The cause challenge is denied.
MS. MATO: All right. I would move for a peremptory strike then on her.
THE COURT: That is granted.
MR. CASASNOVAS: If we raise a Ne[il] Slappy, it would be academic at this point.
THE COURT: You do what you want. You are the lawyer.
MR. CASASNOVAS: We raise a Ne[il] Slappy. She is a black female, Judge.
THE COURT: And I just heard an explanation, I believe why.
MR. CASASNOVAS: That is why I am saying whether it’s academic or not. I don’t know whether Your Honor would consider it.
THE COURT: No, but she is off the jury anyway. You kicked her off.
*1125 Right?
MS. MATO: I would ask that — I would ask to exercise a peremptory on her.
THE COURT: We need another juror then, No. 6.
THE CLERK: Yes.
THE COURT: Next one up is, defense, Pena?
MS. WRIGHT: Your Honor, if we could just have some clarification.
MR. CASASNOVAS: We asked for a peremptory on Lorie.
THE COURT: That was No. 4.
MR. CASASNOVAS: That was No. 13.
MS. MATO: That was your fourth peremptory.
MR. CASASNOVAS: That was granted.
THE COURT: Yes.
MR. CASASNOVAS: I’m sorry, Judge. I’m falling asleep.
THE COURT: How many do we have, Jan?
THE CLERK: Five jurors, Judge.
THE COURT: So, No. 18, Pena, defense?
MR. CASASNOVAS: We accept.
MS. MATO: We accept, Judge.
THE COURT: All right. That is six again. Prosecution, do you change your mind about anybody?
MS. MATO: No, Judge.
THE COURT: Defense, do you change your mind about anybody?
MR. CASASNOVAS: Your Honor, we respectfully change our mind on Pena, No. 18, after consulting.
THE COURT: All right. Peremptory challenge on her, whatever.
MS. MATO: Your Honor, at this time—
THE COURT: Wait. Wait. Is that a peremptory challenge?
MR. CASASNOVAS: Yes.
THE COURT: That is your fifth.
MS. MATO: Your Honor, I would raise a Ne[il] Slappy challenge. She is the second or actually the third Hispanic female that the defense has sought to kick off the panel. So I would ask for a race neutral, gender neutral reason.
THE COURT: All right. Sir.
MR. CASASNOVAS: She was the victim of a theft and she is also a supervisor in the Building Department.
THE COURT: I will tell you what. I’m going to — this is Christmas. I’m going to grant your motion. She is off.
MS. MATO: That would be over the State’s objection, Judge.
THE COURT: No. 19, prosecution?
MS. MATO: Accept.
MR. CASASNOVAS: We accept, Judge.
THE CLERK: Six.
THE COURT: That is six again. Defense, have you changed your mind about anybody?
MR. CASASNOVAS: No.
Well, we objected to Buchholz already. No, Judge. Not at this point.
THE COURT: Prosecution?
MS. MATO: Judge, I would exercise a peremptory on Juror No. 16.
MR. CASASNOVAS: Your Honor, we object respectfully.
THE COURT: Yoü are requiring an explanation?
MR. CASASNOVAS: Requiring an explanation, she is a black female and this is the — how many so far — so far.
*1126 THE COURT: I require — -what is your explanation?
MS. MATO: Yes, Judge. My reason for striking her is that her husband who she has been married to for a while has been arrested before and has been — has served time in prison for gun charges.
THE COURT: That’s correct. All right.
MR. CASASNOVAS: My recollection, with all due respect, she was asked by Ms. Mato and she said he was treated fairly by the State.
MS. WRIGHT: Furthermore, she had never really discussed the charges that he had been convicted of with her husband and that by the time she had gotten together with him, that case had already been closed out.
THE COURT: That is true, but it is a ground under case law, as I recall from other research, so it is granted.
So, now we’ve got No. 20, defense. That is Zenck. She is gone.
MR. CASASNOVAS: She is cause.
MS. MATO: She is gone.
THE COURT: No. 21, prosecution?
MS. MATO: I accept.
MR. CASASNOVAS: We accept.
THE COURT: That is six again. Any further objections from anybody?
MS. MATO: Judge, I would move to strike Juror No. 9, Ms. Wallace.
MR. CASASNOVAS: Your Honor, we have a deep seated objection. This is the — I lost count of all the black females that she has stricken.
THE COURT: I don’t think she is black.
MR. CASASNOVAS: She is a black female, Judge. She is a black female. This is a black defendant and he needs to be judged by a jury of his reasonable peers, not white folks in Dade County. This is our objection, Your Honor.
We are now seeing a pattern with regard to the State seeking to strike all black jurors in this case.
MS. MATO: You are asking for a race neutral, gender neutral reason?
THE COURT: Yes.
MS. MATO: Judge, she indicated earlier she was familiar with the area where this crime occurred. She also indicated that she had been — let’s see, that her brother had been arrested for domestic violence. She had been a witness to his domestic violence case. Her father had been arrested also for drug possession and her brother had also been arrested for stealing driver license forms. She was also the victim of a crime. She had been sexually harassed earlier.
For the record, Judge, I have sought to strike Hispanic males and Hispanic jurors from this panel so those are my grounds for striking Juror No. 9, Judge.
THE COURT: Under the case law, as I understand it, your motion is granted.
MR. CASASNOVAS: Over our respectful objection.
THE COURT: That is fine. Next one up, then, is No. 22, I think. Yes, defense, Apizar?
MR. CASASNOVAS: We accept.
MS. MATO: I accept, Judge.
THE COURT: All right. That is six again.
Any further objections from anybody?
MR. CASASNOVAS: We move to strike Ms. Apizar, No. 22.
MS. MATO: And, Your Honor, she is another Hispanic female which has been— which defense has sought to strike from *1127 the panel. I’m asking for a race neutral, gender neutral reason.
MR. CASASNOVAS: How do you know she is Hispanic?
MS. MATO: Her name is Mara Isel Alpizar.
MR. CASASNOVAS: It could be Polish.
MS. MATO: Her last name is Hispanic.
THE COURT: Do you want to bring her in and ask her if she is Hispanic?
MR. CASASNOVAS: All right, yes.
THE COURT: Bring her in.
MS. BAIL: What is her name, Judge?
THE COURT: Alpizar.
MR. CASASNOVAS: You ran her for priors?
MS. MATO: Yes, I ran everybody.
THE BAILIFF: Ms. Alpizar.
(Thereupon, Ms. Alpizar entered the courtroom and the following proceedings were had:)
THE COURT: Ma’am, just a little questioning here. Is your national background Latin?
MS. ALICEA [sic]: Yes.
THE COURT: Are you from the United States or were you born someone else?
MS. ALPIZAR: Cuba.
THE COURT: You were born in Cuba?
MS. ALPIZAR: Yes.
THE COURT: Thank you very much.
(Thereupon, Ms. Alpizar exited the courtroom and the following proceedings were had:)
THE COURT: All right. Your objection to Ms. Alpizar is overruled. I believe that is six.
Am I correct?
THE CLERK: Yes, Judge.
THE COURT: Numerically correct. Whether I am legally correct will be tested by the District Court of Appeal. Right, Jan, six?
THE CLERK: Yes, Judge.
THE COURT: All right. Jan, just so we are absolutely correct—
THE CLERK: Yes. Lawrence is Juror No. 2. Cue is Juror No. 3.
MR. CASASNOVAS: Buchholz.
Over our objection.
THE CLERK: Lineberger is five and we are on six now.
THE COURT: All right. Now, let’s get an alternate. Next one up is.
MS. MATO: No. 23.
THE CLERK: Judge, you don’t have six jurors as of yet.
MS. MATO: Yes, we do.
THE CLERK: I thought you read Alpi-zar. Was she stricken?
THE COURT: No.
THE CLERK: That is six.
THE COURT: The alternate, without objection, would be Castaneda.
MS. WRIGHT: Actually, Your Honor, I believe that would be cause on Castaneda.
MS. MATO: I would agree, Judge.
THE COURT: No. 24, Smith?
MR. CASASNOVAS: I have no objection.
MS. MATO: I have no objection to her, Judge.
THE COURT: Shirley Smith will be the alternate. Are we sufficient with one?
THE CLERK: Yes, Judge.
MS. MATO: Do you think we need a second one just in case?
*1128 Judge, can we get a second one, just in case. We might as well. We have people left.
THE COURT: Next one is 25, Ulloa?
MS. MATO: I accept her, Judge.
MR. CASASNOVAS: We have an objection to her language. I’m not sure. She was very clear when she spoke.
THE COURT: You object to Ulloa, whatever the name, No. 25?
MS. MATO: They think she has language difficulty or something.
THE COURT: All right. No. 26 would be next. Diaz, any problem with him or her?
MS. MATO: I have no objection, Judge. I accept her. Supper is waiting. I’ve got to get to it.
MR. CASASNOVAS: Objection, Judge. We will keep her.
THE COURT: She is the second alternate. All right.
Jan, just so we can absolutely be sure. Please recite the names of the people on the jury.
THE CLERK: No. 8, Colas, Orlando Colas. No. 6, Duke Lawrence. No. 12, Earl Buchholz. No. 19, Manuel Caban. No. 21, John Lineberger. No. 22, Mara Aipizar, and No. 24, Shirley Smith. Digna Diaz.
THE COURT: Would you bring them in, please?
MR. CASASNOVAS: Judge with respect to—
THE COURT: Hold on a minute.
MR. CASASNOVAS: We just are, for the record, accepting subject to all prior motions and objections.
THE COURT: Very well.
MR. CASASNOVAS: Specifically with regard to Mr. Buchholz, we disagree with Your Honor, respectfully.
THE COURT: Fine. Bring them in, please.
(Thereupon, the prospective jurors entered the courtroom at 5:50 p.m.)
THE BALIFF: Please be seated.
THE COURT: Ml right. Note for the record the presence of the defendant and the jury. Folks, we are going to now announce the names of the people who have been selected. If you hear your name called, it means that you have been selected on the jury.
If your name is not called, please get up, leave your badge on the desk and you may go home.
Ml right, Jan.
THE CLERK: Orlando Colas, Duke Lawrence, Earl Buchholz, Manuel Caban.
THE COURT: Manuel what?
THE CLERK: Caban, thank you. John Lineberger, Mara Mpizar.
THE COURT: Mara Mpizar, Shirley Smith and Digna Diaz.
THE COURT: Digna Diaz. Ml right. Those folks please remain seated. The rest of you, please get up, put your badge on the desk and you may go.
(Thereupon, the prospective jurors exited the courtroom and the following proceedings were had:)
THE COURT: Folks, would you move that way? Sir, white shirt, sir.
That’s fine. Come on up other folks, please.
We have all eight here.
Please swear the jurors, please.
(Thereupon, the jurors and the alternates were duly sworn.)
*1129 [[Image here]]
[instructions given to the jury by the trial court]
(Thereupon, the jury exited the courtroom at 6:00 p.m. and the following proceedings were had:)
THE COURT: All right.
MR. CASASNOVAS: Your Honor, one last just supplementing of the record, one sentence.
THE COURT: Go ahead.
MR. CASASNOVAS: For the record, all jurors, with the exception of Ms. Smith, are white or white Latinos, white or white Latinos, just for the record because the record will speak for itself as to the challenges that were made by the State on the black jurors.
THE COURT: Anything else?
MR. CASASNOVAS: For now, no.
THE COURT: See you tomorrow at ten o’clock.
MR. CASASNOVAS: Have a nice day.
THE COURT: You will be here earlier, though.
(Thereupon, the proceedings were adjourned until 10:00 a.m. the following day).
CANADY, C.J., concurs.

. A transcript of the selection process that included any Melbourne issues is attached as an appendix.

. The defense noted for the record that all the seated jurors with the exception of Ms. Smith were white or white Latinos. See appendix at 49. The majority states that the objection was based on ethnicity, not race. See majority op. at 1113-14 n. 5. However, under our case law, the dispositive legal analysis concerns whether the venireperson is a member of a cognizable class, a determination that considers ethnicity, race, or gender as well as other factors. See, e.g., Alen, 616 So.2d at 454-55.

. In Curtis v. State, 685 So.2d 1234, 1237 (Fla.1996), this Court was presented with the issue of "whether the [Melbourne ] guidelines apply when a peremptory challenge is exercised against a white venireperson.” In that case,- the State objected on discrimination grounds after the defendant attempted to use a peremptory strike on a white venireperson. Curtis, 685 So.2d at 1236. This Court held that "the [Melbourne ] guidelines apply across the board to each ‘venireperson [who] is a member of a distinct racial group.’" Id. at 1237 (quoting Melbourne, 679 So.2d at 764).

. MR. CASASNOVAS: We move to strike Ms. Alpizar, No. 22.
MS. MATO: And, Your Honor, she is another Hispanic female which has been — which defense has sought to strike from the panel. I’m asking for a race neutral, gender neutral reason.
MR. CASASNOVAS: How do you know she is Hispanic?
MS. MATO: Her name is Mara Isel Alpizar.
MR. CASASNOVAS: It could be Polish.
MS. MATO: Her last name is Hispanic.
THE COURT: Do you want to bring her in and ask her if she is Hispanic?
MR. CASASNOVAS: All right, yes.
THE COURT: Bring her in.
MS. BAIL: What is her name, Judge?
THE COURT: Alpizar.
' MR. CASASNOVAS: You ran her for priors?
MS. MATO: Yes, I ran everybody.
THE BAILIFF: Ms. Alpizar.
(Thereupon, Ms. Alpizar entered the courtroom and the following proceedings were had:)
THE COURT: Ma’am, just a little questioning here. Is your national background Latin?
MS. ALICEA [sic]: Yes.'
THE COURT: Are you from the United States or were you born someone else?
MS. ALPIZAR: Cuba.
THE COURT: You were born in Cuba?
MS. ALPIZAR: Yes.
THE COURT: Thank you very much. Appendix at 43-44.

. See majority op. at 1115 ("All that is required is for the trial court to briefly ask a juror as to his or her ethnicity in these rare circumstances where a party has objected to the use of a peremptory challenge on that basis and there is no support in the record as to whether the prospective juror is in fact a member of that cognizable class.”).

. The defendant was a black man charged with the crimes of burglary with an assault or battery with a knife, robbery using a deadly weapon, aggravated assault, and seven counts of resisting with violence and aggravated assault on a law enforcement officer.

. The defense apparently includes "Latinos” among "white folks" because the attorney later noted that "[f]or the record, all jurors, with the exception of Ms. Smith, are white or white Latinos, white or white Latinos, just for the record because the record will speak for itself as to the challenges that were made by the State on the black jurors.” Appendix at 49. Accordingly, it is apparent from the record that Mr. Buchholz, the challenged juror at issue, is white and was presumed by the trial judge to be of German descent because of his name.